WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Brechler, | No. cv-06-00940-PHX-ROS |
| Plaintiff, | **ORDER** |
| vs. | |
| Qwest Communications International, Inc., et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Decertification (Doc. 308). For the reasons stated herein, Defendants' Motion will be granted.

BACKGROUND

Plaintiffs are 81 current or former Sales Consultants (or Sales and Service Consultants)[1] at Qwest's Phoenix Consumer Call Centers. Consultants perform a variety of tasks, including answering incoming phone calls and processing sales orders. Consultants are supervised by "Coaches," each of whom manages a team of 12-20 consultants. In theory, Qwest's policy is to compensate employees at time and a half or double time for all hours worked over 40 hours per week.

---

[1] The two positions appear to involve essentially the same duties.

1   In practice, the employees allege that Qwest would pay only "incidental" overtime,
2   that is for tasks that came up at the end of the workday, and that this overtime could not
3   exceed over an hour a day. However, they were also required to be available to take calls for
4   85% of their standard workday and to perform off-the-telephone job tasks as well. The
5   workers allege that these off-the-telephone job tasks necessarily took up more than 15% of
6   a standard eight hour day but were expected to be completed by the company in the standard
7   workday. Further, the employees describe pressure to meet sales quotas and state that they
8   were subject to discipline if they failed to meet those quotas. The employees also describe
9   financial incentives paid to coaches whose team of consultants reached their sales quotas,
10  which they say gave coaches an incentive to ignore and even tacitly encourage overtime
11  work among their team members.
12  The employee plaintiffs now bring suit as a similarly situated class against Qwest for
13  the alleged unpaid overtime. Defendants move for decertification of that class.

## ANALYSIS

15  Under the Fair Labor Standards Act ("FLSA"), employers are required to compensate
16  their non-exempt hourly employees for time worked over 40 hours at no less than one and
17  a half times their normal hourly rate. 29 U.S.C. § 207(a)(2). Employees who are not
18  compensated may bring suit on their own behalf and on behalf of others "similarly situated."
19  29 U.S.C. § 216(b). The process of determining who is similarly situated is a two-step one.
20  First, prior to discovery, the court, using a "fairly lenient" standard, determines if notice
21  should be sent to potential class members. Mooney v. Aramaco Services, Inc., 54 F.3d 1207,
22  1214. This generally results in conditional certification of the class; potential members may
23  opt out. Id.
24  Second, following discovery, the defendant may file a Motion for Decertification,
25  after which the court, more information now before it, considers whether the plaintiffs are
26  truly similarly situated. Id. Here, "the burden is on the Plaintiff to prove that the individual
27  class members are similarly situated." Proctor v. Allsups Convenience Stores, Inc., 250
28  F.R.D. 278 (N.D. Tex. 2008). "[T]his does not mean they must establish that they are

1  'identically situated.'" Id.  Rather, they must show that there is "a demonstrated similarity
2  among the individual situations . . . some factual nexus which binds the named plaintiffs and
3  the potential class members together as victims of a particular alleged [policy or practice.]"
4  Heagney v. European Am. Bank, 122 F.R.D. 125, 127 (E.D.N.Y. 1998).  Decertification is
5  then mandated if "the action relates to specific circumstances personal to the plaintiff rather
6  than any generally applicable policy or practice."  Burt v. Manville Sales Corp., 116 F.R.D.
7  276, 277 (D. Colo. 1987).  The court must consider whether it can "coherently manage the
8  class in a manner that will not prejudice any party."  Johnson v. TGF Precision Haircutters,
9  Inc., CV-H-03-3641, 2005 U.S. Dist. Lexis 44259 at *32 (S.D. Tex. Aug. 17, 2005).

10  Decertification has been found appropriate by courts where plaintiffs were subject to
11  varying work conditions in different stores or by different managers.  In Johnson, for
12  instance, the class was decertified because: (a) the class encompassed both hair stylists and
13  receptionists, with quite different job duties; (b) the class members worked at over 90
14  locations within the state of Texas; and (c) overtime pay policies seemed to be set by store
15  rather than by the company as a whole; stores reported different handling of overtime pay.
16  2005 U.S. Dist. Lexis at *9-14.  Another court refused even the initial, conditional
17  certification on the ground that a corporate policy to keep wages low had effects that were
18  "neither homogenous nor [loaned] themselves to collective inquiry."  Basco v. Wal-Mart
19  Stores, Inc., CV-00-3184, 2004 U.S. Dist. Lexis 12441 at * 22 (E.D. La. Jul. 2, 2004).  In
20  Basco, the court found that the evidence demonstrated "that the 'policy' was not even
21  uniformly or systematically implemented at any given store."  Id.

22  Conversely, other courts emphasize that having "worked in different areas of the
23  country," and "performed different jobs is not dispositive."  Crain v. Helmerich & Payne Int'l
24  Drilling Co., CV-92-0043, 1992 U.S. Dist. Lexis 5367 at * 7 (E.D. La. Apr. 16, 1992).  In
25  Crain, plaintiffs contended that class members "were required to attend various types of job-
26  related meetings and training sessions, and were required to participate in other 'self-study'
27  programs and were not paid their hourly and overtime wages for the time they spent engaged
28  in these activities."  Id. at * 5.  Crucially, they did "not allege isolated personal incidents of

1 failures to pay, but rather contend that they and the potential class members were victims of
2 a company-wide policy that employees would not be paid for this time." Id. at 5-6. Nor,
3 where retirees alleged they were coerced into accepting early retirement, was the fact that
4 "each retiree . . . faced a unique package of incentives, as well as a unique set of alleged
5 coercions" sufficient to support decertification. Heagney v. European American Bank, 122
6 F.R.D. 125, 127 (E.D.N.Y. 1988). Rather, because the fundamental allegation that the
7 "supposedly voluntary [early retirement plan] was in reality a smokescreen for a deliberate
8 campaign of discrimination" was common to all plaintiffs, the court found them similarly
9 situated. Id.

10 At the outset, it is worth addressing Qwest's argument that "Plaintiffs fail to cite a
11 single case that supports their argument that they are similarly situated because they were
12 subject to *lawful* performance standards." This argument – and others like it in Qwest's
13 briefs – rather misses the point of the certification process. The question of whether lawful
14 performance standards can (and did) give rise to a violation of the FLSA by *de facto*
15 requiring overtime that is then uncompensated is a question common to each class member.
16 It may be a matter of law for the court to resolve or one of fact to be given to the finder of
17 fact. However, Plaintiffs need not establish the correctness of their legal theory during the
18 certification process and questions as to the validity of that theory would not negate that they
19 were "similarly situated" as to the questions of law or fact at issue.

20 Plaintiffs allege a common mechanism through which they were denied overtime.
21 They allege that they were given more work than could be completed in an eight hour day,
22 that they were faced with the possibility of discipline if they failed to complete work, that
23 they worked overtime to complete it, and that there was no mechanism for reporting overtime
24 beyond "incidental overtime," which did not include the tasks performed after hours by
25 Plaintiffs. This version of events certainly paints the picture of employees who are "similarly
26 situated." Plaintiffs allege consistent company policies that created, they say, conditions in
27 which they had no choice but to work unpaid overtime or face disciplinary charges.

28

- 4 -

However, over the course of discovery, it became clear that there were a number of material differences between Plaintiffs as well. Some were disciplined when they failed to complete tasks, others were not. Some were told to stop working overtime by managers and complied; others were not and did not. Time overrun varied between plaintiffs. And some managers report seeing employees work overtime; others report they never did and would have insisted that overtime be reported and compensated if they had. In at least one case, an employee and plaintiff, Virginia Crane, was asked at a team meeting not to work after hours. She complied and was at no point disciplined for failing to complete her work or for not meeting sales quotas, suggesting that it was not universally impossible to finish the work required in an eight hour shift, or at least that employees were not universally disciplined for failing to do so. Crane survey, Pl. Ex. S. Further, Qwest has provided evidence stating that, at least at some call centers, employee time was carefully monitored and those taking a call on or performing after call paper work would be contacted in order to bring them back into "adherence" with the schedule. Dec. of Ralon Violette, Def. Ex. N.

The question, then, is whether these differences between each plaintiff would bear on the inquiry done by the court or by the finder of fact to the point that the plaintiffs can no longer be considered "similarly situated." Certainly, it is troubling that Qwest – in spite of their statements that overtime would be compensated – has described no system for reporting any other than "incidental" overtime. However, the burden here is on Plaintiffs and discovery has not ultimately produced evidence of a unified policy. Instead, Plaintiffs' case relies on a subtler system of pressure and coercion that, ultimately, appears to have to have been backed or not by the individual managers. This system might have been supported implicitly by central corporate policies, such as a lack of a system for reporting non-incidental overtime. However, Plaintiffs were not affected equally or in the same manner by this system, and the results on all of them – in the amount of overtime that went uncompensated or the disciplinary action they faced when they did not work that overtime – is lacking in consistency. Plaintiffs cannot be termed "similarly situated."

Accordingly,

1 | **IT IS ORDERED** Defendants' Motion is **GRANTED**.

3 | DATED this 17th day of March, 2009.

_____
Roslyn O. Silver
United States District Judge